UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ANNMARIE SWEETAPPLE ESCHMANN,

                                    Plaintiff,

          -against-                                    **MEMORANDUM & ORDER**

MICHAEL J. ASTRUE, Commissioner                        Civil Action No. 09-1325
of Social Security,                                    (DRH)
                                    Defendant.
-------------------------------------------------------X

**APPEARANCES**:

**For Plaintiff**:
Office of Christopher James Bowes
54 Cobblestone Drive
Shoreham, New York 11786
By:      Christopher James Bowes, Esq.

**For Defendant**:
Loretta E. Lynch
United States Attorney for the Eastern District of New York
610 Federal Plaza,
Central Islip, New York 11722
By:     Diane C. Leonardo-Beckmann, Assistant U.S. Attorney

271 Cadman Plaza East
Brooklyn, New York 11201
By:     Michelle L. Christ, Special Assistant U.S. Attorney

**HURLEY, Senior District Judge**:


          Plaintiff Ann Marie Sweetapple Eschmann ("Plaintiff") commenced this action pursuant

to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social

Security (the "Commissioner" or "Defendant") which denied her claim for disability benefits.

Presently before the Court are Defendant's motion and Plaintiff's cross-motion for judgment on

the pleadings.  For the reasons discussed below, the decision of the Commissioner is reversed and the matter is remanded for rehearing pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## BACKGROUND

### I.    Procedural Background

Plaintiff applied for Social Security disability insurance benefits and Supplemental Security Income ("SSI") on May 23, 2007.  (Transcript (hereafter "Tr.") 59-62.)[1]  Plaintiff alleged disability commencing on May 1, 2007 due to knee and back pain, left hip numbness, sleep apnea, and anxiety.  (Tr. 124-25.)  The claim was denied initially on September 20, 2007. (Tr. 52-59.)  On September 28, 2007, Plaintiff requested a hearing before an administrative law judge ("ALJ") (Tr. 60), and a hearing was held before ALJ Brian J. Crawley on November 10, 2008, at which Plaintiff appeared represented by counsel.  (Tr. 19-49.)  The ALJ issued a decision on November 25, 2008 finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 9-18.)  Plaintiff requested review by the Appeals Council ("AC").  (Tr. 5-7.)  By notice dated January 27, 2009, the AC denied Plaintiff's request, rendering the ALJ's decision as the "final decision" of Defendant.  (Tr. 1-3.)

### II.   Factual Background

#### A.    Non-Medical Evidence

##### 1.    Hearing Testimony

Plaintiff was born on January 12, 1964.  (Tr. 83, 88).  She has completed high school as well as two years of college.  (Tr. 131.)  From 1986 to 1996, Plaintiff worked as a production

---

[1] Page citations are to the transcript of the administrative record filed by the Commissioner in this case.

room assistant for a photo company. (Tr. 126.) She did not work outside the home between approximately 1997 and 2002 in order to raise her children. (Pl.'s Mem. at 2.) In 2002 she began working as a part-time library clerk at the North Babylon Public Library, where she continued to work as of the date of the hearing. (Tr. 22, 126.) Plaintiff testified that at the time of the hearing she worked two four-hour shifts, for a total of eight hours per week, because "that's all [she] can tolerate" due to her "chronic back pain, an injury to [her] neck and . . . some nerve damage in the lower area." (Tr. 23.) Plaintiff testified that she stands up throughout her entire four-hour shift at the library, although she occasionally leans on a chair. (Tr. 41.) Plaintiff further testified that as of Spring 2007 she attended college part-time (two days per week), but "decided to stop" because she "couldn't sit there for three hours at a time." (Tr. 23-28.)

Plaintiff testified that she was not able to sit or stand for "long periods of time" and that she experience numbness in her left leg and pain in her back when she sits for extended periods. (Tr. 28, 34, 36, 135). She also reported difficulty turning her neck. (Tr. 34.) She testified that she experienced constant pinching neck pain, as well as constant back pain. (Tr. 35-36). Plaintiff stated that she can only sit for a half-hour; if she sits for any longer she experiences pain throughout her lower body and numbness in the left leg. (Tr. 39-40). She testified that she could walk around a store for approximately twenty minutes to one hour. (Tr. 40.)

Plaintiff testified that she was currently not taking any pain medication. (Tr. 38.) She testified that she had tried Percocet a few days prior to the hearing, but "won't ever take it again because [she did not] have a good response" to it. (Tr. 38.) She had been taking Tylenol PM to help her sleep, but one of her doctors advised her to stop because recent blood tests revealed she had a "fatty liver" and elevated liver enzymes. (Tr. 38.) Plaintiff also testified that she tried to

3

take Ultram, but that she did not "feel right" on that medication – she felt as though she had "an altered state of consciousness." (Tr. 46.) She also tried Propoxyphene but could not take that medication because it "made [her] ill." (Tr. 47.) At an appointment a few days prior to the hearing, Plaintiff's physician recommended that she take Advil, but as of the date of the hearing she "[hadn't] bought it yet." (Tr. 47-48.) Plaintiff obtained some temporary relief from physical therapy, but she testified that she stopped attending physical therapy because her insurance stopped covering it. (Tr. 39, 43.) She testified that she had difficulty sleeping because of back pain and leg numbness, and she stated that she slept continuously for five to six hours per night. (Tr. 43-44.)

Plaintiff testified that she lives with her husband and her three children, aged 10, 12, and 18. (Tr. 29-30.) Plaintiff testified that, on a day-to-day basis, "I'm a mom" and so she "take[s] care of whatever needs" they have. (Tr. 29.) She does "a lot of laundry" for the entire family, but has recently begun teaching her eldest son how to do the laundry because she is "having a hard time" getting up and down the stairs. (Tr. 29.) During the week, Plaintiff either cooks dinner for the family or orders take-out. (Tr. 31.) On the weekends, she sometimes prepared three meals a day for her family. (Tr. 31.) Plaintiff also does the food shopping for the entire family, which she spreads out over two or three trips per week. (Tr. 32.) While food shopping, Plaintiff could carry a gallon of milk, but left the cases of water in the car for her teenaged son to carry. (Tr. 32.) She packed the grocery bags lightly and carried them herself from the supermarket to the car. (Tr. 32-33.) Plaintiff attested that she drove every day, but she experienced numbness in her leg and back pain when she drove. (Tr. 33.) Plaintiff takes her

daughter, who functions on the high end of the autistic spectrum, to social skills counseling every Thursday morning and takes her other daughter to dance class once per week. (Tr. 29-30.)

Plaintiff testified that she spends her leisure time lying on the couch watching cooking shows on television. (Tr. 34.) She testified that she gets "uncomfortable" if she lays in one position for too long, and described the sensation of "hav[ing] a cinder block sitting on your shoulder blades and it's kind of hard to breathe." (Tr. 34-35.)

## 2. Plaintiff's Work Activity Report

On May 23, 2007, Plaintiff submitted a work activity report in conjunction with her application for benefits. (Tr. 107-14.) Plaintiff reported that she started working as a library clerk in April 2002 and continued to work in that position. (Tr. 110.) She stated that she worked an average of 12 hours per week and earned $16 per hour. (Tr. 110.) Plaintiff received no special work conditions or services. (Tr. 112.) Plaintiff states that she was "only working part time, although [she] earn[ed] about [$]920.00 each month of March and April 2007," and that she "will restrict one hour of overtime each month at the least so [she] can stay under the allowable 2007 limit of [$]900.00 monthly." (Tr. 114.)

## 3. Plaintiff's Disability Report

In a disability report date June 27, 2007 (Tr. 134-41), Plaintiff stated that she lived in an apartment with her three children. (Tr. 134.) She reported that she worked 12 hours per week in the North Babylon Library. (Tr. 135.) Plaintiff stated that each morning, she woke her three children and made sure they ate and left for school on time. (Tr. 135.) Plaintiff also cared for her daughter, who is autistic. (Tr. 135.) If Plaintiff felt "OK," she visited her mother, did food shopping (about twice per month), did laundry, or attended doctors' appointments. (Tr. 135.)

5

With assistance from her daughters, Plaintiff fed and cleaned the cages of her pet guinea pigs. (Tr. 135.) Plaintiff reported that she prepared "all meals" for her family on a daily basis, although she "sometimes order[ed] out." (Tr. 136.) She reported that she and two of her children can use the microwave, and her family has been eating "more fast foods recently." (Tr. 136.) She also watered her garden. (Tr. 137.) Plaintiff went outside on a daily basis to walk her children to the bus. (Tr. 137.) She also reported that "sometimes [she] just want[s] to nap [and] be left alone." (Tr. 137.) Plaintiff reported that she could drive but that she "could not drive alone to a place [she had] never been before" because she would experience anxiety attacks. (Tr. 137.) Plaintiff reported that she shopped in stores for her children's clothes, school supplies, and food, and that she could pay bills, count change, handle her savings account, and use a checkbook or money orders. (Tr. 138.) Plaintiff enjoyed art as a hobby, and although she had not engaged in that hobby "for a long time" she expressed a desire "to start drawing again." (Tr. 138.)

Plaintiff also reported that she saw a psychologist once per week and took Wellbutrin for anxiety. (Tr. 135, 142.) Although Plaintiff would go out to breakfast once per week with others, Plaintiff complained that some of her neighbors annoyed her. (Tr. 139.) Plaintiff said that she could not take her children on long walks and could not stand at work for more than two to three hours without discomfort and pain in her knees. (Tr. 139.) She reported that her knee and back pain affected her ability to stand, walk, climb stairs, and kneel. (Tr. 139.) Plaintiff stated that she experienced sleep apnea and woke three to four times per night. (Tr. 135.) Plaintiff stated that she could follow spoken and written instructions, but "sometimes cannot focus." (Tr. 140.)

Plaintiff reported that occasionally she just "say[s] what I feel," and that she lost one job because she "spoke her mind." (Tr. 140-41.)

**B.** *Medical Evidence*

**1.** **Plaintiff's MRI Results Prior to May 1, 2007 Onset**

Plaintiff underwent an MRI of her right knee on September 24, 2003. (Tr. 190.) The MRI showed small joint effusion, femoral trochlear dysplasia, and a small one island involving the proximal tibia. (Tr. 190.) The MRI did not revel an meniscal or ligamentous tear. (Tr. 190.)

A July 19, 2004 MRI of Plaintiff's cervical spine revealed straightening of the normal cervical lordosis, a central disc herniation at the C4-5 level, and a left parasagittal disc herniation at the C5-6 level. (Tr. 172.)

**2.** **Dr. Salvatore J. Palumbo – Neurosurgeon**

Dr. Salvatore J. Palumbo began treating Plaintiff on December 20, 2004 and noted that Plaintiff was a well-developed female in no apparent distress who had been experiencing subscapular pain on the left side since the birth of her first child. (Tr. 178.) Plaintiff complained of intermittent numbness in her right arm as well as intermittent pain and numbness radiating into the left upper extremity, which had since subsided. (Tr. 178.) Plaintiff had chronic subscapular discomfort, and reported that any upright activity tended to exacerbate her pain. (Tr. 178.) Local trigger point injections provided Plaintiff some temporary relief. (Tr. 178.) Dr. Palumbo's examination revealed no tenderness upon palpation of the cervical spine. (Tr. 178.) Plaintiff reported mild discomfort with palpation deep on the left side of her back. (Tr. 178.) Motor examination showed normal tone and bulk. (Tr. 178.) Plaintiff retained full motor power in all muscle groups. (Tr. 178.) Sensation was intact to light touch and pinprick, and deep

7

tendon reflexes were mildly diminished in the left bicep.  (Tr. 178.)  All other reflexes were

symmetric.  (Tr. 178.)  Dr. Palumbo also reviewed an MRI of Plaintiff's cervical spine,[2] which

demonstrated a small, punctate disc extrusion at C5-6 as well as mild to moderate foraminal

stenosis on the left side at the C6 exit zone.  (Tr. 178.)

Dr. Palumbo opined that Plaintiff had chronic pain mainly in the left subscapular area and

it was quite feasible that her chronic discomfort could be a radicular phenomenon.  (Tr. 178.)  Dr.

Palumbo concluded that Plaintiff constituted an "excellent candidate" for physical therapy and

stated that he would have her evaluated for a selective nerve root block at the left C6 exit zone.

(Tr. 179.)  Dr. Palumbo expressed hope that Plaintiff would obtain "significant relief of her

discomfort" through these "minimally invasive maneuvers."  (Tr. 179.)  He noted that if Plaintiff

did not improve, he would likely move toward EMG and nerve conduction studies.  (Tr. 179.)

He stated that any further treatment decisions would be made based upon the results of her

physical therapy and the electrodiagnostic studies.  (Tr. 179.)

On January 28, 2005, Dr. Palumbo reported seeing Plaintiff for a follow-up examination

regarding her complaints of left upper extremity radiculopathy.  (Tr. 177.)  Plaintiff was still

awaiting authorization for pain management treatment from her insurance company.  (Tr. 177.)

Dr. Palumbo noted that she did have a C6 disc extrusion with neural compression.  (Tr. 177.)

On a subsequent visit, on March 31, 2005, Dr. Palumbo noted that Plaintiff had improved

with physical therapy.  (Tr. 176.)  He observed that Plaintiff had a minimally diminished reflex in

her left bicep, but was otherwise doing well.  (Tr. 176.)  He suggested epidural steroids but

Plaintiff was "not sure if she wants to pursue" that course of treatment.  (Tr. 176.)  As of a May

_____

[2]        The Court presumes this refers to the July 19, 2004 MRI, described *supra*.

5, 2005 visit, Plaintiff's condition was unchanged. (Tr. 175.) She still showed a "mildly" reduced brachioradialis reflex in her left bicep, but was otherwise fully intact. (Tr. 175.) She "refuse[d]" to pursue epidural steroids or further physical therapy. (Tr. 175.)

Plaintiff next visited Dr. Palumbo on October 13, 2006, when she complained of mid thoracic back pain and mild discomfort in her lower back and neck. (Tr. 174.) Dr. Palumbo noted her prior history of cervical radiculopathy, but stated that Plaintiff had previously obtained relief by treating the condition conservatively with physical therapy. (Tr. 174.) Dr. Palumbo noted that Plaintiff had no further radiculopathic symptoms, and stated that the majority of her current pain was not caused by cervical pathology, but was of a musculoskeletal nature in her mid thoracic back. (Tr. 174.) Dr. Palumbo strongly recommended Plaintiff consider physical therapy and chiropractic treatment, as a cost effective and holistic way to treat her discomfort, and stated that "[t]here are no recommendations I would make from a neurosurgical standpoint." (Tr. 174.)

### 3. Dr. Wendy B. Doret, Ph.D. – Psychologist

Dr. Wendy B. Doret, Ph.D., a psychologist who had been treating Plaintiff since June 2006, completed a report on April 19, 2007. (Tr. 186-187.) Plaintiff was receiving outpatient mental health treatment for dysthymic disorder (diagnosis code 300.4 on the DMS-IV Axis I).[3] (Tr. 186.) Dr. Doret indicated that Plaintiff had a global assessment of functioning ("GAF")

---

[3]     Based on the DMS-IV-R multiaxial system, Axis I calls for diagnosis of clinical syndromes; Axis II calls for diagnosis of developmental or personality disorders; Axis III calls for diagnosis of physical disorders and conditions; Axis IV calls for the severity of psychosocial stressors; and Axis V calls for a global assessment of functioning. *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 27-34 (4th ed. 2000). In regard to Axis I, Dr. Doret wrote 300.4, which is the diagnostic code for dysthymic disorder. *See id.* at 376-81.

score of 62.[4]  (Tr. 186.)  Dr. Doret stated that on occasion Plaintiff experienced episodes of

behavior that interfered with activities of daily living, but also found no evidence of functional

limitations.  (Tr. 186.)  Dr. Doret stated that Plaintiff could work 20 hours per week and could

participate in a rehabilitation program, with the only necessary accommodation being the care for

her autistic child.  (Tr. 187.)  Dr. Doret noted that Plaintiff was already enrolled in college

classes.  (*Id.*)

### 4.    Dr. Glenn Arvan – Orthopedic Surgeon

Dr. Glenn Arvan, who treated Plaintiff on a monthly basis beginning in September 22,

2003, completed a report on May 1, 2007 and diagnosed a left knee sprain, right knee internal

derangement, left shoulder bursitis, and herniated discs.  (Tr. 188-89.)  He noted that Plaintiff

was discharged from physical therapy because she experienced no improvement.  (Tr. 188).  Dr.

Arvan opined that Plaintiff was moderately limited in her ability to walk and sit (2-4 hours each)

and to lift or carry (20 pounds occasionally, 10 pounds frequently), and was very limited in her

ability to stand (1-2 hours), push/pull/bend, and climb stairs.  (Tr. 189.)  Finally, he believed that

Plaintiff could work part-time for "17 hours a week."  (Tr. 189.)  Dr. Arvan noted, however, that

he was awaiting the results of MRIs taken of both Plaintiff's knees.  (Tr. 189.)

### 5.    Results of Plaintiff's May 2007 MRIs

---

[4]      "The GAF is a [100-point] scale promulgated by the American Psychiatric
Association to assist 'in tracking the clinical progress of individuals [with psychological
problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting
Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32 (4th ed. 2000))
(first alteration added).  A GAF of 61-70 is assigned to individuals with "[s]ome mild symptoms
(e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school
functioning . . . but generally functioning pretty well, has some meaningful interpersonal
relationships." *Id.* at 262 (internal quotation marks omitted) (quoting Am. Psychiatric Ass'n,
*Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed. 2000)).

A May 10, 2007 MRI performed on Plaintiff's left knee revealed a small joint effusion, mild medial patella displacement, and a small bone island involving the lateral aspect of the medial femoral condyle, but no evidence of meniscal or ligamentous tears. (Tr. 191.) An MRI of the right knee performed on May 11, 2007, showed femoral trochlear dysplasia, a small medial ganglion cyst, a small joint effusion, degeneration of the anterior and posterior horns of the medial and lateral menisci, and bone islands in the lateral tibia plateau and lateral femoral condyle. (Tr. 193.) The MRI also revealed mild red marrow hyperplasia in the distal femur. (Tr. 193.)

On July 10, 2007, Plaintiff underwent a full-body bone scan, which was a normal study. (Tr. 192.)

### 6. <u>Dr. Kevin Duffy – Psychologist</u>

On August 1, 2007, Dr. Kevin Duffy, a psychologist, conducted a consultative psychiatric evaluation of Plaintiff. (Tr. 194-97.) Plaintiff told Dr. Duffy that she lived with her spouse and three children. (Tr. 194.) She reported that she had worked 12 hours a week as a library clerk since April 2001. (Tr. 194.) Plaintiff was never hospitalized for psychiatric reasons and never attended outpatient treatment. (Tr. 194.) She went to a counselor once a week. (Tr. 194.) Plaintiff was prescribed Wellbutrin but she reported to Dr. Duffy that "she does not take it." (Tr. 194.)

Plaintiff reported frequent awakening at night and increased appetite that caused her to gain twenty pounds in the prior few months. (Tr. 194.) Plaintiff denied depressive symptoms, although she admitted to feeling more depressed in the winter. (Tr. 194.) She denied thoughts of death or suicide. (Tr. 194.) Plaintiff reported excessive apprehension and worry, difficulty

concentrating, and muscle tension.  (Tr. 194.)  Plaintiff reported panic symptoms, including

palpitations and trembling.  (Tr. 194.)  She denied manic or thought disorder symptoms.  (Tr.

194-95.)  Plaintiff's cognitive symptomatology and deficits included some concentration

difficulties.  (Tr. 195.)

Upon mental status evaluation, Plaintiff was cooperative and presented with generally

adequate social skills.  (Tr. 195.)  She appeared her stated age, dressed appropriately, and

maintained good personal hygiene and grooming.  (Tr. 195.)  She exhibited a normal gait,

posture, and motor behavior, and made appropriate eye contact.  (Tr. 195.)  Plaintiff's speech was

intelligible and fluent.  (Tr. 195.)  She showed coherent and goal-directed thought process.  (Tr.

195.)  Her affect appeared somewhat apathetic, and her mood was dysthymic.  (Tr. 195.)

Plaintiff's sensorium was clear, and she was oriented to person, place, and time.  (Tr. 195.)  Her

memory, attention, and concentration appeared to be generally intact, and she was able to count

and perform some simple calculations without error.  (Tr. 195-96.)  Plaintiff reported that she

dressed, bathed, and groomed herself, cooked and prepared food, did the laundry and preformed

house cleaning, and managed money.  (Tr. 196.)  Plaintiff drove and reported good socialization.

(Tr. 196.)  Plaintiff's interests included her children, gardening, camping, and watching

television.  (Tr. 196.)

Dr. Duffy reported that Plaintiff retained the ability to understand and remember simple

instructions and could perform simple tasks independently.  (Tr. 196.)  Plaintiff was able to

maintain attention and concentration.  (Tr. 196.)  He opined that Plaintiff could learn new tasks,

make appropriate decisions, relate adequately with others, perform tasks independently, deal

appropriately with stress, maintain a regular schedule, and follow and understand simple

instructions. (Tr. 196.) Dr. Duffy noted that the results of the examination appeared to be consistent with psychiatric problems, but in itself, they did not appear to be significant enough to interfere with Plaintiff's ability to function on a daily basis. (Tr. 196.) Dr. Duffy diagnosed mild depressive disorder (not otherwise specified). (Tr. 197.) Dr. Duffy recommended psychiatric intervention, although he noted that Plaintiff reported that "she is not compliant with medications because she likes to treat herself holistically." (Tr. 197.)

### 7. Dr. Samir Dutta[5]

Dr. Samir Dutta performed a consultative orthopedic examination of Plaintiff on August 1, 2007. (Tr. 198-201.) Plaintiff stated that she had persistent neck pain (for two years), lower back pain causing pain on her left side, shoulder pain, numbness in her left hip, and chronic knee pain. (Tr. 198.) Plaintiff also reported a 15-year history of sleep apnea. (Tr. 198.)

Plaintiff reported working as a clerk and librarian on a part-time bases for a total of 12 hours per week. (Tr. 199.) Plaintiff stated that she cooked, cleaned, shopped, laundered clothes, and cared for her children. (Tr. 199.) Plaintiff was also able to care for her own personal needs. (Tr. 199.) She stated that she read, ate out, watched television, listened to the radio, and socialized with friends. (Tr. 199.)

Dr. Dutta noted that Plaintiff appeared to be in no acute distress. (Tr. 199.) She walked with a normal gait, could walk on her heels and toes without difficulty, and she completed a full squat. (Tr. 199.) Plaintiff used no assistive devices, required no assistance changing for the examination or getting on and off the examination table, and rose from a chair without difficulty. (Tr. 199.) Plaintiff showed a flexion of her cervical spine of 35 degrees, flexion of her thoracic

---

[5] Dr. Dutta's report does not specify what type of medicine he practices. (Tr. 198.)

13

and lumbar spine of 85 degrees, lateral bending of 20 degrees, and a rotation of 20 degrees. (Tr. 199-200.) There was a slight tenderness noted at the thoracic and lumbar spinal region. (Tr. 200.) She demonstrated a full range of motion in regard to her elbows, forearms, wrists, fingers, and ankles bilaterally. (Tr. 200.) Plaintiff evidenced a shoulder forward elevation of 135 degrees, an abduction of 135 degrees, and full internal and external rotation in her shoulders. (Tr. 200.) In regard to her hips and knees, Plaintiff exhibited hip flexion of 90 degrees bilaterally and knee flexion of 130 degrees bilaterally. (Tr. 200.) Plaintiff displayed no evidence of instability, effusion, or joint inflammation in her lower extremities. (Tr. 200.) The examination revealed no signs of muscle atrophy or sensory abnormality, her reflexes were equal, and she retained full muscle strength (5/5) throughout her arms and legs. (Tr. 200.)

Dr. Dutta diagnosed central herniation at C4-C5 and C5-C6, chronic low back strain, and right knee femoral trochlear dysplasia. (Tr. 200.) He opined that Plaintiff had a "[m]ild limitation of sitting, standing, walking, lifting, and carrying heavy weight on a continued basis." (Tr. 200.)

### 8.  Dr. J. Kessel – State Agency Psychiatrist

On September 18, 2007, Dr. J. Kessel, a non-examining State agency psychiatrist, found that Plaintiff had a depressive disorder but concluded that Plaintiff's "depressive symptoms do not fulfill the criteria for a major depressive disorder or a bipolar disorder." (Tr. 208.) Dr. Kessel also found that Plaintiff had an anxiety disorder that did not satisfy the diagnostic criteria for anxiety related disorders. (Tr. 210.) Dr. Kessel found that Plaintiff had mild limitations in activities of daily living, social functioning, and concentration, persistence or pace. (Tr. 215.) He also found that Plaintiff was moderately limited in her ability to respond appropriately to

changes in the work setting.  (Tr. 220.)  Dr. Kessel stated that the case evidence indicated that "because of her depressive and anxiety complaints, she has minor limitations in adaptation, but these appear to be less than significant."  (Tr. 221.)  Dr. Kessel determined that Plaintiff could understand, remember, and carry out simple and detailed instructions.  (Tr. 221.)  He further opined that Plaintiff could concentrate for extended periods of time, could relate appropriately to coworkers and supervisors, and could adapt adequately to changes in the work environment.  (Tr. 221.)

### 9.     Dr. Eric Shapiro – Specialist in Physical Medicine and Rehabilitation

On February 6, 2008, Plaintiff saw Dr. Eric Shapiro with complaints of bilateral neck pain, left shoulder blade pain, tingling and numbness in her left hand, bilateral knee pain, and left low back pain with tingling and numbness in the left lower extremity.  (Tr. 224.)  Plaintiff reported that stress, sitting, lifting, carrying and neck movements aggravate her neck and shoulder blade pain, which was relieved only by use of a heating pad, hot shower, and physical therapy.  (Tr. 224.)  Plaintiff stated that the tingling and numbness in her left hands wakes her up at night.  (Tr. 224.)  With respect to her left low back and bilateral knee pain, Plaintiff reported that standing, walking, sitting and bending aggravate the pain, while only changing positions, laying down, hot showers, heating pads, and physical therapy have helped to relieve that pain.  (Tr. 224.)  Plaintiff reported that her position as a library clerk required her to bend, lift, twist, and carry up to approximately 10 pounds.  (Tr. 224.)  Dr. Shapiro noted that Plaintiff had no history of her legs giving way with ambulation or  problems with urine or stool incontinence.  (Tr. 224.)

On March 21, 2008, Dr. Shapiro conducted EMG testing of Plaintiff's lower extremities. (Tr. 225-27.)  The results revealed evidence consistent with a bilateral S1 radiculopathy.  (Tr. 227.)

On May 7, 2008, Dr. Shapiro noted that Plaintiff had not reported any changes in pain and that she had attended five physical therapy sessions.  (Tr. 228.)  Dr. Shapiro stated that the maximum amount of medical benefit would be achieved if she attended physical therapy three times per week and performed a full exercise regimen daily as instructed by the therapist.  (Tr. 228.)

On June 11, 2008, Plaintiff reported that her insurance had approved her for 14 physical therapy sessions, but the sessions all had to be completed within a two-week period.  (Tr. 229.) Plaintiff reported definite benefits with respect to her neck pain from physical therapy, but her upper extremity, low back and lower extremity pain remained about the same.  (Tr. 229.)  Dr. Shapiro again recommended physical therapy three times per week.  (Tr. 229.)

On July 8, 2008, Plaintiff reported no change in her neck and low back pain, but stated that she understood that she cannot improve with only five physical therapy visits.  (Tr. 230.)  A physical examination revealed pain on palpation for the bilateral upper trapezius, rhomboid, and lumbrosacral  muscles.  (Tr. 230.)

On October 8, 2008, Plaintiff reported that her physical therapy was no longer covered by her insurance.  (Tr. 231.)  After examining Plaintiff, Dr. Shapiro diagnosed cervical radiculopathy and possible double crush syndrome, as well as lumbrosacral radiculopathy, cervical and lumbar strain/sprain, left meralgia paresthetica, and sacral torsion and pelvic obliquity.  (Tr. 231.)  Dr. Shapiro recommended physical therapy three times a week, further

nerve conduction and electromyography studies, continued treatment with Dr. Palumbo, and a re-evaluation in six weeks.  (Tr. 231.)

On November 6, 2008, Dr. Shapiro completed a "Medical Assessment of Ability to Do Work-Related Activities" form.  (Tr. 232-34.)  He opined that during the course of an eight-hour workday, Plaintiff: (1) could lift/carry up to 15 pounds occasionally for up to 15 minutes; (2) could sit for 30 minutes without interruption (although he did not specify the total amount of time during an eight-hour workday that she could sit); (3) could never climb, balance, stoop, crouch, kneel, or crawl; and (4) "cannot stand for four hours straight."  (Tr. 233, 234.)  Plaintiff could not work around heights because "[i]t would be dangerous."  (Tr. 234.)  Finally, she could not push a cart full of books and tapes or carry a basket full of books on her arm.  (Tr. 234.)

All of Dr. Shapiro's examinations revealed that Plaintiff responded satisfactorily to sharp and dull sensory testing on the lower and upper extremities.  (Tr. 228-31.)  On each visit Plaintiff's reflexes were 2+ throughout and her muscle strength was full (5/5), except on October 8, 2008, when Plaintiff exhibited weakness in the left hamstring (4/5).  (Tr. 231.)  The straight leg raising test was generally negative.  (Tr. 228-31.)

## DISCUSSION

### I.   *Legal Standards*

#### A.   *Review of the ALJ's Decision*

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court may set aside a determination of the ALJ only if it is "based upon

legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted). "Substantial evidence is 'more than a mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'" *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case de novo. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004). Thus the only issue before the Court is whether the ALJ's finding that Plaintiff was not eligible for disability benefits was "based on legal error or is not supported by substantial evidence." *Rosa*, 168 F.3d at 77.

**B.    *Eligibility for Disability Benefits***

To be eligible for disability benefits under the Social Security Act (the "SSA"), a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id*. § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims. See 20 C.F.R. § 404.1520. This Circuit has described the procedure as follows:

>First, the [Commissioner] considers whether the claimant is
>currently engaged in substantial gainful activity. If he is not, the
>[Commissioner] next considers whether the claimant has a "severe
>impairment" which significantly limits his physical or mental
>ability to do basic work activities. If the claimant suffers such an
>impairment, the third inquiry is whether, based solely on medical
>evidence, the claimant has an impairment which is listed in
>Appendix 1 of the regulations. If the claimant has such an
>impairment, the [Commissioner] will consider him disabled
>without considering vocational factors such as age, education, and
>work experience . . . . Assuming the claimant does not have a listed
>impairment, the fourth inquiry is whether, despite the claimant's
>severe impairment, he has the residual functional capacity to
>perform his past work. Finally, if the claimant is unable to perform
>his past work, the [Commissioner] then determines whether there
>is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (alterations in the original) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467

(2d Cir. 1982) (per curium)).   The claimant bears the burden of proof at steps one through four,

while the burden shifts to the Commissioner at step five to show that the claimant is capable of

working.  *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

**C.**       ***The Treating Physician Rule***

Social Security regulations require that an ALJ give "controlling weight" to the medical

opinion of an applicant's treating physician so long as that opinion is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2); *see also Rosa*,

168 F.3d at 78-79.  The "treating physician rule" does not apply, however, when the treating

physician's opinion is inconsistent with the other substantial evidence in the record, "such as the

opinions of other medical experts."  *Halloran*, 362 F.3d at 32; *see also Veino v. Barnhart*, 312

F.3d 578, 588 (2d Cir. 2002).  When the treating physician's opinion is not given controlling

weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). These factors include: (1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)(i-ii) & (d)(3-6); *see also Halloran*, 362 F.3d at 32. Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with good reasons for doing so. 20 C.F.R. § 404.1527(d)(2).

In addition, it is clearly stated law in the Second Circuit that "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (emphasis added); *see also Rivera v. Sullivan*, 923 F.2d 964, 968-69 (2d Cir. 1991) (reviewing Second Circuit law on retrospective diagnosis and reversing denial of benefits where retrospective diagnosis of treating physician not given sufficient weight with regard to degenerative condition).

Finally, the ALJ may not reject the treating physician's conclusions based solely on inconsistency or lack of clear findings without first attempting to fill the gaps in the administrative record. *Rosa*, 168 F.3d at 79. "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,'" even if the claimant is represented by counsel. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Sec'y of Health & Human*

*Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Butts v. Barnhart,* 388 F.3d 377, 386 (2d Cir. 2004) ("It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits.") (internal quotation marks and alteration omitted), *amended on other grounds on rehearing*, 416 F.3d 101 (2d Cir. 2005). Specifically, this duty requires the Commissioner to "seek additional evidence or clarification" from the claimant's treating sources when their reports "contain[ ] a conflict or ambiguity that must be resolved" or their reports are "inadequate for [the Commissioner] to determine whether [claimant] is disabled." 20 C.F.R. §§ 404.1512(e), (e)(1). The Commissioner "may do this by requesting copies of [the claimant's] medical source's records, a new report, or a more detailed report from [the claimant's] medical source." *Id.* § 404.1512(e)(1). The only exception to this requirement is where the Commissioner "know[s] from past experience that the source either cannot or will not provide the necessary findings." *Id.* § 404.1512(e)(2). If the information obtained from the claimant's medical sources is not sufficient to make a disability determination, or the Commissioner is unable to seek clarification from treating sources, the Commissioner will ask the claimant to attend one or more consultative evaluations. *Id.* § 404.1512(f).

## II.     *The ALJ's Decision*

Applying the five-step analysis enumerated in 20 C.F.R. § 404.1520, the ALJ found that Plaintiff satisfied the first two steps, to wit: (1) Plaintiff's part-time work as a library clerk did not rise to the level of substantial gainful activity; and (2) Plaintiff's cervical herniations, lumbar syndrome, right knee pain, and anxiety/depression were severe impairments. The ALJ concluded that Plaintiff did not meet the third step, however, because her impairments did not meet or equal in severity any impairment in the Listing of Impairments, Appendix 1, Subpart P, Part 404 of the

Regulations. The ALJ next found under the fourth factor that Plaintiff had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). Specifically, the ALJ found that "during the course of an eight hour workday, [Plaintiff] can sit for up to six hours, stand/walk four hours and lift/carry fifteen pounds." (Tr. 14-15.) The ALJ also found, however, that Plaintiff's impairment precluded performance of her past relevant work, which required work above the sedentary exertional level.

Once the ALJ determined that Plaintiff was not able to perform her past relevant work, the ALJ proceeded to the fifth and final step, viz., determining whether the Commissioner had established that there was other work Plaintiff could have performed. Taking into account Plaintiff's age (43), education (high school degree), residual functional capacity (full range of sedentary work), and ability to communicate in English,[6] the ALJ applied Medical-Vocational Rule 201.28, 20 C.F.R. Part 404, Subpart P, Appendix 2, and found that Plaintiff was not disabled.

Accordingly, after the five-step analysis was completed, the ALJ determined that Plaintiff was not disabled under the SSA. (Tr. 33).

## III.    *The Parties' Arguments*

Plaintiff asserts two main objections to the ALJ's decision. First, Plaintiff contends that sedentary work requires prolonged sitting, and a claimant's inability to engage in prolonged sitting precludes her from meeting the demands of sedentary work as a matter of law. (Pl.'s Mem. at 18-20.) Plaintiff contends that the ALJ improperly rejected Dr. Arvan's opinion that

---

[6]     The ALJ found that the transferability of Plaintiff's job skills "is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of 'not disabled,' whether or not the claimant has transferable skills." (Tr. 17.)

Plaintiff could sit for only two to four hours and that the ALJ did not properly consider Dr. Shapiro's assessment that Plaintiff can only sit for thirty minutes continuously.  (*Id.* at 21-22.)  According to Plaintiff, therefore, because the record contained evidence that Plaintiff could not perform the full range of sedentary work, the ALJ improperly relied on the Medical-Vocational Guidelines to determine that she was not disabled.  Instead, Plaintiff argues, the ALJ "should have consulted a vocational expert to ascertain whether there were a substantial number of jobs available" to Plaintiff.  (*Id.* at 23.)

Plaintiff also asserts that the ALJ improperly concluded that her testimony about the intensity and limiting effects of her symptoms lacked credibility because of her "'lack of [use of] pain medication.'" (*Id.* at 23.)  Plaintiff argues that the ALJ failed to consider the side effects that those medications had on Plaintiff.  (*Id.* at 24.)

## IV.     *Application of the Governing Law to the Present Facts*

### A.     *Nature of Sedentary Work*

"Sedentary work is the least rigorous of the five categories of work recognized by SSA regulations."  *Schall v. Apfel*, 134 F.3d 496, 501 n.6 (2d Cir. 1998) (listing the five categories as "very heavy," "heavy," "medium," "light," and "sedentary") (citing 20 C.F.R. § 404, Subpart P, Appendix 2).  Sedentary work "involves lifting no more than 10 pounds at a time," "occasionally lifting and carrying articles like docket files, ledgers, and small tools," and "occasionally" "walking and standing" as necessary to carry out job duties.  20 C.F.R. § 404.1567(a) (cited in *Schall*, 134 F.3d at 501 n.6; *Polidoro v. Apfel*, 1999 WL 203350, at *5 (S.D.N.Y. Apr. 12, 1999)).  The Second Circuit has held that "the concept of sedentary work contemplates substantial sitting."  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  Social Security

Ruling 83-10 ("SSR 83-10") specifies that at the sedentary level of exertion, "sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6 (1983). The Second Circuit has found that SSR 83-10 is "not binding on the ALJ because the language of the Ruling is merely precatory." *Ferraris*, 728 F.2d at 587 n.3. The Second Circuit has "suggest[ed], however, that [an] ALJ, when determining whether [claimant] is capable of sedentary work, take into consideration [SSR 83-10], as well as *Wright v. Secretary of the Department of Health and Human Services*, No. Civ. 81-3963 (E.D.N.Y. July 12, 1983) (six hours sitting required for sedentary work), and cases cited therein." *Id.*

The Second Circuit has also stated that, "alternating between sitting and standing may not be within the concept of sedentary work." *Ferraris*, 728 F.2d at 587; *see also Simmons v. Apfel*, 1998 WL 856110, at *5 (S.D.N.Y. Dec. 10, 1998) (same); SSR 83-12, 1983 WL 31253, at *4 (1983) (noting that an individual who must alternate between sitting and standing "is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work . . . or the prolonged standing or walking contemplated for most light work"; while "[t]here are some jobs in the national economy – typically professional and managerial ones – in which a person can sit or stand with a degree of choice," "most jobs . . . demand that a worker be in a certain place or posture for at least a certain length of time").

The Commissioner cites *Kornack v. Chater*, 1996 WL 622187, at *8 (E.D.N.Y. Oct. 22, 1996) for the proposition that an individual can perform the full range of sedentary work when she is able to sit for at least four hours in an eight-hour workday. (*See* Def.'s Mem. at 20 n.6.) In *Kornack*, the court, addressing the question of whether a claimant's ability to sit without limitation and walk/stand for four hours rendered him able to perform "light work," stated that

"the six-hour guideline in Ruling 83-10 is not an absolute requirement." *Id.* The court further

noted that "at least in evaluating sedentary work, which Ruling 83-10 defines as requiring the

ability to sit for approximately six hours out of an eight-hour work day, the Second Circuit has

found the ability to sit up to four hours sufficient." *Id.* (citing *Delamater v. Schweiker*, 721 F.2d

50, 52-54)). In *Delamater*, which pre-dated *Ferraris*, the Second Circuit upheld an ALJ's

finding that a claimant was not disabled when he was able to, *inter alia*, sit or stand for up to four

hours. *Delamater*, 721 F.2d at 54-55. The Second Circuit subsequently noted, however, that

"[t]he standard for sedentary work . . . was not challenged on appeal" in *Delamater*. *Ferraris*,

728 F.2d at 587 n.3. Given that, and given the Second Circuit's more recent suggestion that an

ALJ should take into consideration the six-hour sitting guideline set forth in SSR 83-10, the

Court declines to give precedential weight to *Kornack*.

Here, the ALJ found that Plaintiff retained the residual functional capacity to perform the

full range of sedentary work because "during the course of an eight hour workday, she can sit for

up to six hours, stand/walk [for] four hours and lift/carry fifteen pounds." (Tr. 14-15.) In so

finding, the ALJ specifically "accorded little weight" to Dr. Arvan's opinion that Plaintiff's

ability to sit was limited to two to four hours in an eight hour workday. (Tr. 16.) The ALJ then

applied the Medical-Vocational Guidelines to determine that Plaintiff was not disabled. "The

Medical-Vocational Guidelines (the 'grids') are often used to determine whether alternative

employment exists in the national economy. The grids combine several factors including

education, work experience and age to determine whether a finding of 'disabled' or 'not

disabled' should be rendered." *Koseck v. Sec'y of Health & Human Servs.*, 865 F. Supp 1000,

1012 (W.D.N.Y. 1994). The grids also provide, however, that if an individual is not able to

perform a full range of sedentary work, "an individualized determination" must be made "that considers the impact of the limitations or restrictions on the number of" available jobs. 20 C.F.R. Pt. 404, Subpt. P, App. 2, 201.00(h)(3). In light of the above-cited authority, Dr. Arvan's opinion could have established that Plaintiff would not be able to sit for at least six hours of an eight-hour work day and would not, therefore, be able to perform the full range of sedentary work. Thus, crediting Dr. Arvan's opinion may have resulted in the ALJ being required to perform an "individualized determination" rather than simply referring to the grids.

**B.    *The ALJ Improperly Disregarded Dr. Arvan's Opinion***

As noted above, Dr. Arvan opined that Plaintiff was moderately limited in her ability to sit because she could sit for only two to four hours. (Tr. 189.) The ALJ accorded this opinion "little weight" because "the record does not contain results of any clinical examinations and the opinion was rendered before diagnostic testing was completed." (Tr. 16.) For the reasons set forth below, the Court finds that the ALJ misapplied the treating physician rule.

The ALJ's decision not to accord Dr. Arvan's opinion controlling weight appears to be rooted in Dr. Arvan's notation on the May 1, 2007 Physical Assessment form that he was "awaiting results of new MRI's of both knees." (Tr. 189.) In Section IV "Diagnostic Information" on the same form, however, Dr. Arvan specifically noted that the following "physical exam findings and or objective evidence" supported his diagnoses: (1) September 21, 2003 MRI of Plaintiff's right knee; (2) July 18, 2004 MRI of Plaintiff's cervical spine; and (3) treatment notes from an April 30, 2007 office visit.[7] (Tr. 188.) Based on this information, the

---

[7]    Plaintiff states that the April 30, 2007 treatment notes were not included in the Administrative Record. (Pl.'s Mem. at 22)

record does not support the ALJ's conclusion that Dr. Arvan's opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques and was, thus, not entitled to controlling weight.  The ALJ's failure to follow the treating physician rule constitutes a failure to apply the proper legal standard and is grounds for reversal.  *See, e.g., Speruggia v. Astrue*, 2008 WL 818004, at *9 (E.D.N.Y. Mar. 26, 2008).

### C.    *Assessment of Credibility*

Social Security regulations require an ALJ to consider a claimant's subjective testimony regarding her symptoms in determining whether she is disabled.  *See* 20 C.F.R. § 404.1529(a). An ALJ should compare subjective testimony regarding the frequency and severity of symptoms to objective medical evidence.  *Id.* § 404.1529(b).  If a claimant's subjective evidence of pain is supported by objective medical evidence, it is entitled to "great weight."  *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (internal quotation marks omitted). However, if a claimant's symptoms suggest a greater severity of impairment than can be demonstrated by the objective medical evidence, additional factors must be considered.  *See* 20 C.F.R. § 404.1529(c)(3).  These include daily activities, the location, duration, frequency and intensity of symptoms, the type, effectiveness and side effects of medication, and other treatment or measures to relieve those symptoms.  *Id.*

The ALJ's conclusion that Plaintiff's "impairments are not as limiting as claimant alleges" was based upon the record evidence regarding her daily activities as well as "the lack of pain medication and the fact that she does not take any measures other than medical treatment to relieve pain."  (Tr. 15-16.)  The ALJ did not credit Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms" to the extent they were inconsistent

with the ALJ's finding that she could engage in a full range of sedentary work. (Tr. 15.) This would included Plaintiff's extensive testimony about her limited ability to sit for extended periods of time. (*See* Tr. 23-28, 39-40.)

As discussed above, Plaintiff testified that she attempted to take several different pain medications but ultimately discontinued the use of each of them due to intolerable side effects. (*See* Tr. 38, 39, 43-44, 45-47.) Social Security Ruling 96-7p explicitly provides:

> [T]he adjudicator must not draw any [credibility] inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide . . . that may explain . . . failure to seek medical treatment. . . . The explanations provided by the individual may provide insight into the individual's credibility. For example: . . . The individual may not take prescription medication because the side effects are less tolerable than the symptoms.

SSR 96-7p, 1996 WL 374186, at *8 (July 2, 1996).

Here, notwithstanding the traditional deference given an ALJ with respect to evaluating credibility, *see Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984), the ALJ's decision to disregard Plaintiff's testimony in this case is not supported by substantial evidence. The ALJ failed to consider Plaintiff's explanation for her failure to continue using various pain medications that she tried; namely, that the side effects were less tolerable than her symptoms. *See, e.g.*, *Green v. Astrue*, 2007 WL 2746893, at (S.D.N.Y. Sept. 17, 2007) (remanding where ALJ failed to develop evidence of reason claimant failed to take medication, and instructing ALJ to consider credibility guidelines in SSR 96-7p, including "the reasons for any 'non-compliance'").

Finally, the ALJ failed to provide a thorough assessment of Plaintiff's credibility as

required by the Commissioner's own ruling:

> It is not sufficient [for the adjudicator] to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186 at *4. Absent such findings, a remand is required. *See, e.g.*, *Schultz v. Astrue*, 2008 WL 728925, at *13 (N.D.N.Y. Mar. 18, 2008).

Here, the ALJ stated that Plaintiff's testimony lacked credibility based, in part, on her failure to "take any measures other than medical treatment to relieve pain." (Tr. 16.) The Court finds that this statement is not "sufficiently specific to make clear . . . the reasons for [the] weight" given to Plaintiff's subjective complaints. Thus, on remand, the ALJ is directed to properly consider Plaintiff's testimony about the side effects of her medications and to make the requisite findings of the "specific reasons for the finding on credibility," as described above. *See* SSR 96-7p, 1996 WL 374186 at *4.

## V.      *The Matter is Remanded*

"Courts have declined to remand if the record shows that a finding of disability is compelled and only a calculation of benefits remains." *Medina v. Apfel*, 2001 WL 1488284, at *4 (S.D.N.Y. Nov. 21, 2001); *cf. Schall*, 134 F.3d at 504 (courts may not award benefits unless the existing record compels the conclusion that the claimant has met criteria for establishing disability). "Conversely, if the record would permit a conclusion by the Commissioner that the

plaintiff is not disabled, the appropriate remedy is to remand for further proceedings." *Medina*, 2001 WL 1488284 at *4 (internal quotation marks and alterations omitted). On this record, the Court cannot conclude that there is persuasive proof of disability such that remand would serve no useful purpose.

Even if the opinion of Dr. Arvan (that Plaintiff could not sit for longer than two to four hours at a time) was given controlling weight by the ALJ, such evidence would not automatically establish Plaintiff's entitlement to disability benefits. Dr. Arvan's testimony, in conjunctions with Dr. Shapiro's testimony that Plaintiff could sit only for thirty minutes at a time, could lead to a finding that Plaintiff did not have the capacity to perform the full range of sedentary work. *See* SSR 96-9p, 1996 WL 374185, at *4 (July 2, 1996). Social Security Ruling 96-9p ("SSR 96-9p") provides that "the mere inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability. There may be a number of occupations . . . that an individual may still be able to perform." *Id.*; *see also Halloran*, 362 F.3d at 33 ("The regulations do not mandate the presumption that all sedentary jobs in the United States require workers to sit without moving for six hours, trapped like a seat-belted passenger in the center seat on a transcontinental flight."). SSR 96-9p provides that if an individual cannot sit for six hours, "the unskilled sedentary occupational base will be eroded" and the extent of the limitation should be considered in determining whether the individual has the ability to make an adjustment to other work." SSR 96-9p, 1996 WL 374185, at *6 (noting that, in determining whether an individual's need to alternate sitting and standing can be accommodated, it might be "especially useful . . . to consult a vocational resource").

Accordingly, this case is remanded to allow the ALJ to re-weigh the evidence, developing

the record as may be needed.  *See Pratts*, 94 F.3d at 39 ("When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.") (internal quotation marks omitted).

### *CONCLUSION*

For all of the reasons stated above, this case is remanded for further administrative proceedings consistent with this opinion.  The Clerk of the Court is directed to close this case.


**SO ORDERED.**

Dated:   Central Islip, New York
             May 16, 2011

                                    /s/
                                    Denis R. Hurley
                                    United States District Judge